# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# STATESBORO DIVISION

FILED
Scott L. Poff, Clerk
United States District Court

By jburrell at 2:16 pm, Jul 31, 2018

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR618-005 |
| | ) | |
| ANTHONY DENNINO, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Anthony Dennino has been indicted for failure to register as a sex offender and for possession of child pornography.  Doc. 1 (Indictment filed March 7, 2018).  He contends that his Fourth Amendment rights were violated when a federal agent failed to secure a search warrant either prior to entering his residence to effect his arrest, or prior to accessing data stored on electronic devices later removed from that residence by his landlord during court-authorized eviction proceedings. Doc. 23 (Defendant's amended Motion to Suppress Evidence).[1]  At the motions hearing conducted on July 10, 2018, counsel stipulated that the facts surrounding the entry of Deninno's residence and the search of his

---

[1]  Defendant also moved to suppress all the statements he made during his post-arrest interrogation.   Doc. 20 (Defendant's Amended Motion to Suppress Statements).  For reasons that will be explained below, that motion is now moot.

electronic devices were not in dispute and that the Court could determine the lawfulness of those intrusions by examining the documents attached to Deninno's brief (filed as doc. 23-1) and the additional materials offered by the Government as exhibits at the hearing.  Doc. 31.

After careful review of that undisputed evidence and consideration of counsel's arguments, the Court finds that the motion to suppress is without merit and should be denied.

## I.    BACKGROUND

In October 2016, U.S. Marshal personnel assigned to the New York/New Jersey fugitive task force received an arrest warrant for Anthony Dennino, who had failed to register as a sex offender following his 2015 conviction for possession of child pornography.[2]  Doc. 23-1 at 1-3, 5.  Over the next seven months, task force officers made numerous attempts to locate Dennino through office and field work in various New York cities, all to no avail.  *Id.* at 5-8.  In mid-August 2017, ten months after the search began, an officer learned that Dennino had pawned an

---

[2]  The Sex Offender Registration and Notification Act (SORNA) "requires convicted sex offenders to register, and to keep their registration current, in each jurisdiction where they live, work, and go to school . . .  and 18 U.S.C. § 2250(a) makes it a crime for a convicted sex offender who moves in interstate commerce to fail to abide by the Act's registration requirements."  *Carr v. United States*, 560 U.S. 438, 459 (2010) (Alito, J., dissenting).

item at a store in Vidalia, Georgia on August 14, 2017. *Id.* at 9.

At the request of the New York/New Jersey task force, *id.* at 10, 12, a criminal investigator assigned to the U.S. Marshal's Service in Savannah, Georgia (Michael Harvat) took up the hunt. *Id.* at 13. He determined that there were outstanding warrants for Dennino's arrest, both on the failure-to-register charge from New York and on child molestation charges out of Wheeler County, Georgia. Doc. 31; Govt. Exhs. 1 & 2. Over the next several days, Harvat conducted numerous interviews and set up surveillance in an effort to locate Dennino. Doc. 23-1 at 14-15. Harvat enlisted the service of Wheeler County Sheriff Rigdon, who assisted Harvat in conducting additional interviews of individuals who might have had contact with Dennino. *Id.* at 15.

On August 23, 2017, five days into the manhunt, Sheriff Rigdon notified Harvat that a confidential source had reported that Dennino was "currently residing in a trailer located at 1692 Normantown Road, Lot C, Vidalia, GA 30474." *Id.* at 19. Harvat, Rigdon, and other sheriff deputies then went to that location and spoke with the property's landlord, who confirmed that Dennino and his male companion had been tenants of the trailer since August 1, 2017.

Harvat knocked on the door of the trailer for several minutes but received no response. *Id.* Using a key furnished by the landlord, Harvat and a deputy sheriff then entered the trailer to see if Dennino might be hiding inside. *Id.* The officers found no one in the trailer, but during their quick inspection they observed in plain view numerous articles of clothing, bedding, and electronic devices that suggested the trailer was still occupied. *Id.* Accordingly, Harvat locked the trailer, retained its key (with the landlord's permission), and set up surveillance in the area for the rest of that day in the hope that Dennino or his co-tenant would return to the premises. *Id.* Neither did. *Id.*

During the following week, Harvat continued to inquire of the landlord whether he had seen his tenants or whether they had arranged to pay September's rent. *Id.* at 20. The landlord heard no more form either tenant, so on August 31, 2017, he filed a claim for unpaid rent and commenced eviction proceedings in the Magistrate Court of Toombs County, Georgia. *Id.*; Gov't. Exh. 3. Equipped with the necessary writ of possession, on September 8, 2017 the landlord had the "abandoned" personal property removed from the trailer. Doc. 23-1 at 20. Pursuant to Harvat's previous request, the landlord secured the two cellphones, a

laptop computer, and Dennino's photo I.D. in a separate garbage bag and retained those items at his residence.  *Id.*

A week later, Harvat retrieved those items from the landlord.  *Id.* Because he believed the abandoned electronic devices might contain potential leads to Dennino's whereabouts, Harvat powered up and charged the two cellphones (which, unlike the laptop, were not password protected) and reviewed their contents.  *Id.*  During that review, he observed pictures of Dennino as well as multiple images that he believed to be child pornography.  *Id.*  Accordingly, Harvat arranged to have the phones and the laptop delivered to a GBI agent who worked with the FBI Child Exploitation Task Force.  *Id.*  Harvat also secured an administrative subpoena for the phones' detailed call records in an effort to identify a contact number for the fugitive.  *Id.* at 21.

On October 23, 2017, New York/New Jersey fugitive taskforce officers located Dennino and his brother at a residence in Syracuse, New York.  *Id.* at 22, 23.  Investigator Harvat, who had traveled from South Georgia to New York in pursuit of Dennino, accompanied the arrest team when they made their entry at 2:00 p.m.  *Id.* at 23, 24-25.  Two hours later, Harvat administered *Miranda* warnings to Dennino, received his

5

waiver of those rights, and commenced an interview. *Id.* at 24. Dennino admitted that he and his brother had rented the trailer in Normantown, Georgia and explained that they fled the area because they feared law enforcement was closing in. *Id.* at 25. They left some personal property behind when they walked away from the trailer, slept in the woods the first night, and then made their way north. *Id.* When Dennino eventually bought a bus ticket, he used an alias rather than his real name. *Id.*

Dennino described some of the items he had left in the trailer, but when Harvat asked whether he had left his cellphones and laptop behind, Dennino responded "No." *Id.* at 26. Harvat then advised Dennino that he had located child pornography on those electronic devices. *Id.* Dennino immediately stated, "I don't want to talk anymore." *Id.*; Gov't Ex. 4 (video recording of the interrogation). Rather than breaking off all communication with Dennino, Harvat then indicated that he had found "a lot of stuff" on the electronic devices and that he had turned that information over to the Georgia Bureau of Investigation. Doc. 23-1 at 26; Gov't Ex. 4. This statement prompted Dennino to ask additional questions, and when Harvat advised him that he would be "charged

6

federally" with possession and distribution of child pornography, Dennino admitted he had been accessing child pornography since he was 13 years old.  *Id.*

## II.    DISCUSSION

### A. The entry into Dennino's residence

Dennino first argues that the entry into the trailer where he had been living was "unreasonable" under the Fourth Amendment because officers did not secure a search warrant before invading the sanctity of his home.  Doc. 23 at 4-6.  He reasons that, absent the unlawful entry, the officers would not have known that the two cellphones or laptop computer even existed.  *Id.* at 7.  Hence, he argues, those devices constitute the "fruit of the poisonous tree."  *Id.* at 6.

Dennino never acknowledges that the entry team had multiple warrants for his arrest when they entered the trailer.  Nor does he ever reference the Supreme Court's landmark decision in *Payton v. New York*, 445 U.S. 573 (1980), which held that an arrest warrant in and of itself justifies the physical intrusion of a suspect's home to effect his arrest, provided the officers reasonably believe the suspect is likely at his residence.  As the Court put it:

7

> If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.  Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

445 U.S. at 602-03.

When the Court called the *Payton* decision to defense counsel's attention at the motions hearing, he suggested that the officers lacked any reasonable grounds to believe that he was inside the trailer when they entered.  The undisputed evidence does not support this contention.  While the *Payton* Court did not define the "reason to believe" standard, the Eleventh Circuit has since interpreted that language as requiring a "common sense" approach that is less exacting than probable cause.[3] *United States v. Magluta*, 44 F.3d 1530, 1534-35 (11th Cir. 1995) (reasoning that the *Payton* Court chose its words carefully, intentionally using "reason to believe" rather than "probable cause" as the test for assessing whether police have proper grounds to enter a suspect's home for the purpose of executing a warrant for his arrest); *see* 3 Wayne R.

---

[3]  In issuing warrants for Dennino's arrest, judicial officers had already made a probable cause determination that he had committed some very serious crimes.

8

LaFave, Search & Seizure § 6.1(a) at 355 (5th ed. 2017) (noting that the Supreme Court may have selected this language "so as not to encourage lower courts to adopt a hard-nosed 'probable cause to believe the suspect is in the home' test").  Indeed, it has been suggested that unless the police have information establishing that a suspect is *not* at home, then it is reasonable for them to infer that he is there, thus justifying their entry to effect his arrest.  *Id*. at 357-58 (noting that, "as a rule of thumb," "'rudimentary police procedure dictates that a suspect's residence be eliminated as a possible hiding place before a search is conducted elsewhere'").

When viewed in a common-sense fashion, the evidence in this case certainly furnished the officers with reason to believe that Dennino would be located inside his residence.  Over ten months of investigative work had gone into locating this fugitive from justice.  Through the persistent efforts of an entire team of investigators, Dennino had been tracked from New York to a sparsely populated area of rural South Georgia.  Marshal Harvat had viewed a video of Dennino recently pawning an item at a Vidalia store, and he and a local sheriff had conducted numerous interviews of individuals who had seen Dennino

just days earlier.  Then, a confidential source informed the sheriff that Dennino and his brother had been living in a particular trailer for several weeks and expressed his belief that the two were "currently" at that trailer.   Doc. 23-1 at 19.   The officers corroborated the confidential source's information with the trailer's landlord, who confirmed that Dennino and another male had been tenants of the trailer for several weeks.  It is true that the officers received no response despite knocking on the trailer's door for several minutes.   But it is commonplace for fugitives from justice to stay hidden in their residences rather than open the door to those who are seeking their arrest.  *See United States v. Beck*, 729 F.2d 1329, 1332 (11th Cir. 1984) (the fact that no one responded to an agent's knock at the door "did not mean that no one was home since it was reasonable to expect a fugitive to hide or flee if possible").

Dennino has cited no case, and the Court is aware of none, that has found a *Payton* violation under circumstances similar to those presented here.  These officers, who at long last had located the very place where this fugitive was residing, did not act unreasonably when they entered that residence equipped with multiple warrants for his arrest.   The personal property that they observed in plain view (but did not seize)

during that brief entry was not the "fruit" of any illegality, therefore.

### B. Search of the electronic devices

It is undisputed that the officers who entered the trailer in an effort to locate and arrest Dennino did not seize or touch the electronic devices that they observed in plain view inside the premises. Investigator Harvat was clearly interested in those devices, however, for he thought they might contain stored information that could prove useful in tracking down a fugitive who had successfully eluded capture for many months. Thus, when Harvat learned that the landlord intended to evict the trailer's tenants and toss out the personal property they had abandoned upon their flight, he asked the landlord not to place the cellphones and laptop at the street but to secure them for Harvat's later retrieval. The landlord agreed to do so, and when he notified Harvat that the eviction had occurred, the investigator took custody of the electronic devices. Believing that the devices were abandoned property that enjoyed no Fourth Amendment protection, Harvat then accessed the data on the cellphones.

Dennino argues that Harvat needed a search warrant to do this, for the electronic devices had not been "abandoned" under Georgia law.

Dennino concedes that his landlord "proceeded with a lawful eviction" of the trailer, doc. 23 at 10, and he does not question the landlord's right to remove all personal items from the trailer and have them "placed . . . in the yard." *Id.* at 11.  He further recognizes that any personal items disposed of by a landlord in this manner are "'deemed abandoned under Georgia law.'"  *Id.* (quoting *United States v. Russell*, 2016 WL 6661186 (N.D. Ga. Oct. 3, 2016)); O.C.G.A. § 44-7-55(c) (any personal property of a tenant removed from the premises pursuant to a writ of possession shall be regarded as "abandoned").  Dennino insists, however, that because the landlord secured and took custody of the cellphones and laptop rather than leaving them outside, unprotected, and subject to public inspection, those items were never "abandoned" within the meaning of the Georgia eviction statute and therefore were not subject to warrantless inspection by the investigator.

Dennino is endeavoring to import into Fourth Amendment jurisprudence the esoteric technical details of Georgia landlord-tenant law.  But as another court has noted, "federal appeals courts have unequivocally renounced this technique for analyzing abandonment in the Fourth Amendment context." *Hosea v. Langley*, 2006 WL 314454 at

* 23 (S.D. Ala. Feb. 8, 2006).  Fourth Amendment law is concerned with the reasonableness of a defendant's expectation of privacy in the property seized and searched, *not* with legalistic or technical considerations of his property rights under statutory or common law. *Carpenter v. United States*, 138 S. Ct. 2206, 2214 n.1 (2018) ("we have repeatedly emphasized that privacy interests do not rise or fall with property rights"); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (property and tort law principles do not define the scope of privacy interests protected by the Fourth Amendment); *Katz v. United States*, 389 U.S. 347, 351 (1967) (the Constitution "protects people, not places");.

As the Eleventh Circuit has put it, "arcane concepts of property law do not control an individual's ability to claim Fourth Amendment protection."  *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994).  While ownership remains a factor to be considered in assessing the reasonableness of a defendant's privacy expectations, *United States v. Salvucci*, 448 U.S. 83, 91 (1980), it is not determinative, for "it is possible for a person to retain a property interest in an item, but nonetheless relinquish his or her reasonable expectation of privacy in the object." *United States v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989).

Fourth Amendment law is clear that a person may abandon his or her reasonable expectation of privacy in an item of property. *Abel v. United States*, 362 U.S. 217, 241 (1960) ("There can be nothing unlawful in the Government's appropriation of . . . abandoned property."). Whether such an abandonment has occurred "is primarily a question of intent" which "may be inferred from words spoken, acts done, and objective facts." *Ziegler v. Martin County School District*, 831 F.3d 1309, 1321 (11th Cir. 2016) (quotes and cites omitted); *Ramos*, 12 F.3d at 1022-23; *United States v. McKennon*, 814 F.2d 1539, 1546 (11th Cir. 1987). "The issue is not abandonment in the strict property-rights sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *United States v. Colbert*, 474 F.2d174, 176 (5th Cir. 1973) (en banc).

The totality of the circumstances in this case establish that Dennino retained neither a subjective nor an objectively reasonable expectation of privacy in the electronic devices that he left behind when he fled Georgia and headed to New York knowing that law enforcement

was on his heels.  *See* doc. 23-1 at 25 (prior to invoking his *Miranda* right to remain silent, Dennino conceded that he knew the Marshals were pursuing him).  Dennino simply walked away from the trailer and his personal possessions, slept in the woods for a night, hitched rides, and caught a bus using an alias.  *Id.*  He never contacted his landlord again, either to pay the next month's rent or request the storage of his personal property.  Indeed, as a long-term fugitive from justice experienced in the ways of concealment, it would have been imprudent for Dennino to have contacted the landlord, for that contact may have furnished leads that would have revealed his whereabouts.  Nor did Dennino, who was surviving on the charity of others (doc. 23-1 at 23), even have the apparent means to pay further rent or any storage fees.

Clearly, Dennino voluntarily relinquished all dominion and control over the various items of personal property he left behind in the trailer, including his cellphones and laptop computer.  His conduct reveals his intent -- to abandon those items either because they were too heavy a burden to lug around while fleeing from the authorities, or in the hope that the incriminating evidence stored on those devices would never be discovered, or at least would not be found on his person in the event of

his capture.

Here, without any doubt, Dennino intended to abandon the property he left behind in the trailer. The mere fact that this abandonment was prompted by his knowledge that the police were closing in does not render it involuntary. *Colbert*, 474 F.2d at 176. Because a person can have no reasonable expectation of privacy in items of personal property that he has abandoned, Dennino cannot assert any Fourth Amendment protection for the electronic devices searched by Harvat in this case.

### C. The admissibility of Dennino's Statements

Dennino filed a separate motion seeking to dismiss the statements he made to a federal investigator (Harvat) after he was captured in upstate New York. Doc. 20. While he initially challenged only the voluntariness of those statements, *id.* at 2, at the motions hearing he asserted that Harvat violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), by continuing to question him after he invoked his right to remain silent. The parties stipulated that the Court could resolve both the voluntariness issue and whether there was a *Miranda* violation by an in-camera review of the video recording of Dennino's post-arrest

interrogation.

That recording reflects both that Harvat advised Deninno of his
*Miranda* rights prior to any questioning and that, at the outset of the
interview, Deninno freely and voluntarily waived those rights and agreed
to answer the investigator's questions. Govt. Exh. 4 at 7:33-8:10. But
when Harvat began to ask him about the cellphones and laptop found in
the trailer, Deninno stated "I don't want to talk anymore." *Id*. at 27:35-
40. When Harvat sought clarification, Deninno made clear that he didn't
want to answer questions about either the cellphone *or* the laptop. *Id.* at
27:45-50. Despite Dennino's unequivocal exercise of his right to remain
silent, Harvat then referenced the large amount of "stuff" found on the
electronic devices and stated that the information had been turned over
to the Georgia Bureau of Investigation. *Id.* at 27:55-28:02.

The Court then directed the parties to submit additional briefs
"addressing whether the investigating agent violated *Miranda* by making
comments reasonably likely to elicit further statements from a defendant
who clearly and unequivocally had exercised his right to remain silent."
Doc. 32 at 3. In its supplemental brief, the Government has represented
that it "will not offer as evidence in its case-in-chief any statements made

17

after the Defendant exercised his right to remain silent," though it will endeavor to introduce the statements he made prior to invoking his *Miranda* rights.  Doc. 34 at 2.  Dennino has indicated in his supplemental brief that he now agrees with the Government that he was properly advised of his *Miranda* rights, that he made "a voluntary, intelligent and knowing waiver" of those rights, and that the statements he made before invoking his rights "should not be suppressed."  Doc. 35 at 2.

There is thus no longer any debate about the admissibility of Defendant's post-arrest statements -- those made *before* he invoked his right to remain silent are admissible; those made *after* that invocation of rights will not be offered as evidence in the Government's case-in-chief. Accordingly, Deninno's motion to suppress "all" the statements he made during his interrogation by Harvat is now moot.

### III.   CONCLUSION

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned

18

"Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this 31st day of July, 2018.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA